The plaintiff was in the employment of the defendant company on 10 August 1917, as pattern maker, and had been there for some (152) months previous to this date. He was directed to add one-fourth of an inch to the thickness of a sawdust grate bar. To do this it required a piece of timber one-fourth of an inch thick to be tacked on the old grate bar. While he was at the machine engaged in planing the timber, the latter kicked back and his hand was drawn into the planer and his fingers cut off by the knives.
The following testimony from the record will sufficiently describe the nature of the work and the manner of the injury:
J. S. Lynch, plaintiff, testified: "On 10 August 1917, I was working with Dewey Brothers as pattern-maker, and Mr. George Dewey, foreman of the shop, came into the pattern shop and brought a grate-bar, known as a sawdust grate bar, and asked me to add one-fourth of an inch to the thickness of the bar. To do this it required a piece of *Page 165 
timber one-fourth of an inch thick to be tacked on the old grate bar. I proceeded to get out the timber and make this pattern thicker. The only timber that we had to work with was one and one-fourth (153) of an inch thick and this had to be dressed down to one-fourth of an inch thick. I used what is known as the jointer machine to dress the timber down to the proper thickness. I had no other way to dress it down except by hand, which would have been a very slow process, so I dressed it down on this machine, and was just in the act of making the last cut and had started the piece of timber through the last cut when it kicked back and caught my fingers in the machine and cut them. (Plaintiff shows his hand to the jury and shows that two fingers on his left hand are cut off just above the second joint.) The machine that I was using is what is known as the jointer of buzz-planer — I don't know the name of it. It was an old-style machine."
Q. "Now state whether or not that is a modern and approved machine that is used for doing the same sort of work you were doing on that machine?" A. "No, sir." Defendant objects.
"People called them square-head jointers. In other words, the head is a square of iron in which the knives are bolted and revolved at the rate of twelve of fifteen thousand revolutions a minute, or something like that. A round head, or safety-head, jointer is a round piece of steel and the knives are inserted and work so close to the table of the machine that it would be impossible, I should think, for persons to get their hands in the machine with a safety head. They could not possibly get their fingers in a safety-head machine. The machine was working that morning as usual. It is the duty of the one operating the machine to properly adjust it before working on it, and I made the necessary adjustments on this occasion before I attempted to use it. The machine consists of two tables with knives in the center, and you adjust the machine by turning a wheel which runs the table up or down so that the knives will cut off a certain amount. You can make it cut one-thirty-second of an inch or you can take one-half-inch cut at one time. It is not unusual for timbers to fly back on these machines, as the timber did that I was using on this occasion. In running the piece of timber across this machine you have to hold it in place and push it along. You are pushing forward, and when it flies back it will throw your hands back also, and if your hands come across the knives, or where the knives would touch them, they would cut."
Q. "Suppose it were the more modern safety-head machine, what would happen?" A. "Well, you would get cut or probably skinned, but you could not possibly get your hand in the machine. You would get hurt if your hands touched the knives. The round-head machines were *Page 166 
in general use at the time I was injured. They were in general (154) use at A. T. Griffin Manufacturing Company, Goldsboro Furniture Company, and Wayne Agricultural Works."
Q. "Can you state some place where they do this sort of work at which you observed a safety-head machine in use?" A. "Yes, sir."
Q. "Where?" A. "At A. T. Griffin's."
Q. "A. T. Griffin Manufacturing Company?" A. "Yes, sir, and the Goldsboro Furniture Company, and the Wayne Agricultural Works."
Q. "Have they planers for performing the same kind of work you were performing on this machine?" A. "They have safety-head planers. Is that what you mean?"
Q. "Have you observed this same machine that hurt you since you were injured?" A. "Yes, sir."
Q. "Has its condition changed since you were hurt?"
Defendant objects; sustained, and plaintiff excepts.
"The defendant had knowledge that I was using this machine in my work as pattern maker."
Q. "Can you explain what was the approximate and immediate cause of your hand getting hurt? What was the approximate and immediate cause of your fingers getting cut off?" A. "Well, the immediate cause of my getting my fingers cut off was the machine kicking that board out of my hand and pulling my hand back into the knives. The approximate cause, I should think, would be the fact that it was a machine of this kind — a square-head jointer. If it had been a safety-head jointer I could not have got my fingers cut off. I could not have got them in the machine."
Cross-examination: "I was employed by the defendant as pattern maker, and not as a regular carpenter. I had been using this machine for about five months. I do not know whether they are still manufacturing the square-head machines. There is no difference in the bulk of the machine, except one has the square head and the other has a round head."
Q. "Do you think it is impossible for a man operating a round-head machine to get his hand caught in it?" A. "Yes, sir."
Q. "And get cut?" "No, sir. I don't think it is impossible. It is possible for him to get cut, but it is impossible for him to get his fingers in the machine."
Q. "If the machine is set for one-tenth inch, it would take one-tenth inch off his fingers?" A. "Yes, sir."
Q. "If it is set for one-half inch, it would take off one-half inch?" A. "Yes, sir."
Q. "Can't you tell us, with the machine making 15,000 revolutions *Page 167 
a minute, as you say this machine makes, taking off one-sixteenth of an inch per revolution, how long it would take to (155) cut off your fingers to the extent that they are cut off now?"
A. "Not very long; about a second, I will say."
Q. "Could you get your fingers away in time?" A. "Yes, sir. You could get them away as quick as you could pop your fingers."
Q. "It takes about a second to do that, doesn't it?" A. "Yes, sir."
Q. "Will you describe once more to the jury how you say this accident occurred, and how you had your hand when the accident occurred, and what size piece of timber it was?" A. "I had my hand on the board; this left hand was at that time about six or eight inches in front of the knives, and I had pushed the board that far, and, of course, had it behind the knives until it went far enough for me to change my hand and put it over there."
Q. "The machine kicked the board back?" A. "Yes, sir; and pulled my hand right back across the knives."
Q. "You stated it wasn't unusual for the machine to kick boards like that?" A. "No, sir."
Q. "You had worked with this machine for a period of five months, knowing it didn't have a safety-head on it?" A. "Yes, sir. I was to dress the board down to one-fourth of an inch in thickness, and I was making the last cut when I was injured."
R. F. Mintz testified: That he is now a member of the bar and that previous to his entering upon the study of law worked in woodworking machinery for more than seven years. "I worked at the furniture factory. I have operated a jointer machine. There are two kinds; one known as the square-head jointer and one known as the round-head. The square-head machine is by no means as safe as the round-head jointer, for the reason that the square-head machine operates in such a way that it leaves a cut that your hand could easily be caught in between the frame and the jointer, while the round-head does not. It would cut, but if properly adjusted, would cut only a small nibble, just a small bite at the time."
Q. "State, according to your experience and knowledge, whether or not in operating a safety-head machine an operative could get such an injury as Mr. Lynch suffered?" A. "Such a thing would be possible, but I rather think he would have to hold his hand there for some time. I don't believe that if he used the proper precaution that he would get that bad an injury. I have been seeing round-head jointer machines for about four or five years, I guess. I have seen them in use in Fayetteville and Wilmington. I think a round-head machine would perform the same work in the same way as the square-head machine."
Cross-examination: "A round-head machine could easily be adjusted *Page 168 
to take a deep cut, I suppose, and in my opinion it has as much (156) power as a square-head machine. I do not know of my own knowledge for what purpose this jointer was used down at the foundry of Dewey Brothers, and I do not know what class of timber it was used to work on."
Harrell Pate testified: "I am employed by the Empire Manufacturing Company. They do not have planing machines or jointers where I work. I have seen the jointer machine in operation at the furniture factory. They have round-head jointers there now. The difference between the square-head and round-head jointers is that in the square-head jointer there is a space between each end of the table and the bed where it is low down; there is a space there, and you can get your fingers between the end of the table and the bed, and if you get your fingers in there it keeps drawing them in, and the round-head will not do it. You take a round-head and if your hand strikes it, it will knock it off and will not cut it deep enough to amount to anything. I have observed a safety jointer machine in use at the White Furniture Company at Mebane and Whiteville Furniture Company. I have seen the round-head machine, the first one about eight years ago."
Cross-examination: Q. "According to the testimony of the plaintiff the machine was making 15,000 revolutions per minute at one-sixteenth of an inch. At that rate it would cut off fifteen and ten-sixteenths of an inch per second. How long do you think a man would have to hold his hand there to cut his fingers off?" A. "I don't know."
Q. "I ask you if a round-head machine will cut as deep a cut in a piece of timber as the square-head machine?" A. "No, sir."
Redirect examination: "This joinder machine will sometimes kick the timber back if it happens to strike the end or if there is a knot in it."
There was other evidence to the effect that both kinds of planers would cut the fingers if the board kicked back, but that the round-head machine would not draw the fingers into the machine so as to cut off the hand or the fingers.
At the close of the evidence the defendant moved for a nonsuit, which the court refused to grant. Judgment was entered for the damages assessed by the jury in the verdict, and plaintiff appealed.
after stating the case: The judgment of the court was correct. In passing upon a motion to nonsuit, we should consider the *Page 169 
evidence in the light which tends to support the plaintiff's case, rejecting all that tends to disprove it. There was, perhaps, evidence of contributory negligence on the part of the plaintiff, but it was for the jury to determine the effect of it under the doctrine of the (157) ordinarily prudent man, as it was not of such a nature that reasonable men would not differ in regard to it, and so as to assumption of risk, if that defense was presented in the case at all. It was for the jury to say whether the risk or danger was so obvious and imminent that a man of ordinary prudence, having due regard for his own safety, would not have continued in the service or in the presence of the danger. The essential facts are few. The defendant kept a planer, or jointer, of an old and disused pattern, when there was a newer model approved by those engaged in the same kind of business, that is, planing, and in general use by them. It had been operated in various mills for more than five years, and seems to have been well known, judging from the testimony of the experts. It was a safer machine in that while, if the board being planed should kick back it might inflict an injury to the hands, it would not involve the loss of the hand or fingers, but the wound would be slight.
The plaintiff testified that this very difference between the two machines was what caused his injury. It is strange that the defendant waited so long to install the new model, for the safety of its employees, if for nothing else, as it could, perhaps, have been done for a difference in the cost not exceeding the recovery in this one case. We do not say that defendants must be the "first by whom the new is tried," but they should take care to see that they are not the "last by whom the old is laid aside." Sometimes a little precaution is a good investment, and worth, in the long run, far more than its cost. There can be no doubt that the plaintiff had been permitted to use the machine, and the defendant will not now be heard to say that he was negligent in using it instead of dressing the timber by hand. Whether there was negligence in thus making his choice of methods, was manifestly a question for the jury.
We said in Dunn, v. Lumber Co., 172 N.C. 129, 137: "It was not claimed that there was any defect in the hammer dog itself, but that it was not sufficiently secured, or, if this was not so, that a defect in the machine caused it to fly out and drop on the saw. If the plaintiff was not responsible for the movement of the hammer-dog, and the jury found that he was not, it must have been either improperly secured, or some defect in the machine, either in its original construction or in its needed repair, must have caused the hammer-dog to fall on the saw. It is not always a full performance of the master's duty to provide merely for his servant implements and appliances which are *Page 170 
known, approved, and in general use. He will still be liable for any injury proximately resulting from a failure to perform that duty in any other respect. He is not permitted to put defective machines or appliances in the hands of his servants with which to do the (158) work, even though they may be of the requisite model, or type; and if he is negligent in so doing, and thereby cause injury to the servant, he must answer in damages for the wrong. Ainsley v.Lumber Co., 165 N.C. 122; Kiger v. Scales Co., 162 N.C. 133. This rule has frequently been recognized by us in negligence cases. It is a part of his obligation to furnish appliances, `which are known, approved, and in general use,' but not necessarily all of it, and if he complies with that part of it, and is otherwise negligent in not supplying a reasonably safe place for the work to be done, or reasonably safe machinery, tools, and appliances with which to do it, he falls short of the legal measure of his duty."
And Justice Brown said, in Deaton v. Lumber Co., 165 N.C. 560: "We think that this version of the testimony would justify the jury in drawing the inference of negligence in the manner in which the saw had been placed in its bearings. The manner in which the saw unexpectedly sprang out of its shield and injured the plaintiff, in the way testified by him, is very conclusive evidence that there was something unusually wrong with it, and presents a case where the doctrine of res ipsa loquitur will carry the case to the jury. In this case the facts and circumstances attending the injury speak for themselves, and in the absence of explanation of disproof give rise to the inference of negligence. It is evident that the accident would not have occurred if the saw had not unexpectedly sprung out of its protecting shield. Why it did so is not very clear, but the circumstance calls upon the defendant for explanation."
There are many cases in our reports which set forth the duty of the employer toward his employee, and among them is Hicks v. Manufacturing Co.,138 N.C. 319, where Justice Hoke said: "An employer of labor to assist in the operation of railways, mills, and other plants where the machinery is more or less complicated, and more especially when driven by mechanical power, is required to provide for his employees, in the exercise of proper care, a reasonably safe place to work and to supply them with machinery, implements, and appliances reasonably safe and suitable for the work in which they are engaged, and such as are approved and in general use in plants and places of like kind and character; and an employer is also required to keep such machinery in such condition as far as this can be done in the exercise of proper care and diligence. Witsell v. R. R.,120 N.C. 557; Marks v. Cotton Mills, 135 N.C. 287. True, the employee is said to assume all *Page 171 
the ordinary risks incident to the employment, but it is as well established that dangers attributable to the negligence of the master, when material to be considered, are usually classed under the head of extraordinary risks, and these the employee does not assume. . . . To bring the knowledge of such observed conditions of increased hazard imputable to the master's negligence into the class of (159) ordinary risks which the employee is said to assume, the danger must be obvious and so imminent that no man of ordinary prudence, and acting with such prudence, would incur the risk which the conditions disclose," citing Labatt on Master and Servant, sec. 279a, and other sections; Beach on Cont. Neg., sec. 361; Sims v. Lindsay,122 N.C. 678; Lloyd v. Hanes, 126 N.C. 359; Patterson v. Pittsburg,76 Pa. 389; Kane v. R. R., 128 U.S. 95.
In Lloyd v. Hanes, supra, it is held that there is a wide distinction between more knowledge of danger and voluntary assumption of risk. The latter is a "matter of defense analogous to contributory negligence to be passed on by the jury, who are to say whether the employee voluntarily assumed the risk. It is not enough to show merely that he worked on knowing the danger, but further, it is only where the machinery is so grossly and clearly defective that the employee must know of the extra risk, that he can be deemed to have voluntarily and knowingly assumed the risk."
These principles have been approved and emphasized in more recent opinions of this Court as reported, one of which is very much in point here, Hux v. Reflector Co., 173 N.C. 97. In that case the Chief Justice said: "Upon the above synopsis of the evidence the judge properly refused to nonsuit the case. The machine at which the plaintiff was injured was thirty-five years old; the cogs were exposed and not boxed in any way; there was no safety lever or any other kind of lever to stop the machine. The machine was more dangerous than new machines, and it was not in general use. The plaintiff was doing his duty at the time he was injured; and the defendant's general manager and floor boss both knew the defective condition of the machine and had seen it at work. The case was properly submitted to the jury," citing Ainsley v. Lumber Co., 165 N.C. 122; Steeleyv. Lumber Co., 165 N.C. 27; Kiger v. Scales Co., 162 N.C. 133; Creech v.Cotton Mills, 135 N.C. 680, and other cases.
If we reject that portion of the evidence which is unfavorable and accept that as true which is favorable to the plaintiff, there is sufficient to sustain his cause of action. There is sufficient testimony of his own for the jury as against the motion to nonsuit. Whether he exercised ordinary care in operating the machine, was not a question of law, but of fact, to be settled by the jury. We may select such *Page 172 
testimony as will justify a verdict for him, as that which is true, and reject what is left, as untrue, because the jury may have done that very thing in passing upon the testimony. Whether he kept his hand upon the machine too long, and whether, if he did, it was negligence for him to do so, was plainly for the jury to decide. (160) It may be that upon a fair construction of the evidence, and giving the plaintiff the full benefit of that part of it which is favorable to him, the doctrine of res ipsa loquitur applies, and, if it does, the nonsuit was properly denied.
We have given careful consideration to the case, and to the able argument of defendant's counsel, and, after doing so, we have been unable to discover any error committed by the court.
No error.
Cited: Alexander v. Cedar Works, 177 N.C. 149; S. v. Edmonds,185 N.C. 724; Street v. Coal Co., 196 N.C. 181.