STATE v. H. D. EDMONDS.

(Filed 18 April, 1923.)

1. **Criminal Law — Incendiary—Fires—Evidence—Questions for Jury— Nonsuit.**

   Upon a trial of defendant for setting fire to and destroying his stock of merchandise, there was evidence tending to show that the corporation of which the defendant was largely the owner was heavily indebted and insured, and that the fire had occurred about 10:30 p. m. shortly after the defendant had been in the store; that the firemen found the store locked, and that no entrance had been forced except those they had made to enter to fight the fires, and that the merchandise had the odor of kerosene which the defendant could not explain, etc.: *Held,* sufficient upon which to deny the defendant's motion as of nonsuit, and to take the case to the jury.

2. **Criminal Law—Evidence—Corroborative Evidence.**

   Where, upon a trial of defendant for setting fire to his own store to get the insurance thereon, there is conflicting evidence of the quantity of the merchandise in the store at the time of the fire, and the defendant has become a bankrupt, it is competent for the solicitor to ask the defendant what had become of the stock of goods with reference to the bankruptcy, for the purpose of impeaching his testimony.

3. **Evidence—Hearsay—Appeal and Error.**

   What an insurance agent said to a clerk or agent on delivering a policy of fire insurance is hearsay when testified to by the clerk, and incompetent as direct evidence; and if there was error in the court's excluding it, the error is cured by the agent afterwards testifying as to what he had said to the clerk.

4. **Criminal Law—Evidence—Motive—Identification.**

   While motive for the commission of a crime is not necessary to. be directly proved, the existence of the motive may be evidence to show the degree of the crime, and the identity of the culprit.

46—185

**5. Appeal and Error—Objections and Exceptions—Evidence—Harmless Error.**

> The appellant, by objection, must call to the attention of the trial judge an erroneous statement he has made in stating his contentions to the jury in time to afford the judge opportunity for correction, and an exception otherwise taken will not be considered on appeal.

APPEAL by defendant from *Brock, J.,* at December Term, 1922, of FORSYTH.

The defendant was convicted of setting fire to a store building, at December Term, 1922, of Forsyth Superior Court, Hon. W. E. Brock presiding, and from the judgment upon such conviction appealed to this Court.

The defendant's principal exceptions were exceptions one and four, which were directed to the refusal of the judge to grant judgment as of nonsuit against the State at the conclusion of the State's evidence, and again at the conclusion of all the evidence.

The State's evidence tended to show that on 14 April, 1920, the defendant was operating a store on Main Street in the city of Winston-Salem, selling ladies' and children's wearing apparel, shoes, hats, and men's clothing—a general line of goods. On the night of that day there was a celebration in the city. The store of Edmonds was a two-story, with basement, building, fronting on Main Street, and extending back about sixty feet. On the second floor the defendant kept ready-to-wear goods, children's apparel, and ladies' ready-to-wear, waists, etc. Much of these goods were on tables near the back end of the second floor.

At 10:46 on the night of 14 April, 1920, the alarm of fire called the fire department to this store. What occurred when part of the fire department arrived there is thus told by H. E. Nissen, chief of the fire department, who testified: "The fire had not made any considerable headway when I got there, it had almost burnt through the ceiling, but had not gotten any headway into the blind attic above. Lieutenant Brown headed one chemical line in the rear and I headed another in the front door and up the stairway. I detected the odor of hot kerosene oil as soon as I started up the stairway. The fire was quickly extinguished with chemicals, but the odor of kerosene was still prevalent and pervaded the upper floor to quite an extent. I found some partially burned garments that had the odor of kerosene on them. There was a skylight about the center of the upper floor that went above the roof; I examined that and found it intact. In order to get rid of the smoke, I threw out of the rear window a lot of the stuff that was partially burnt, middy blouse, dress, and perhaps something else. H. D. Edmonds came in the burning building and inquired if all the things were there, and I told him I had pitched a considerable quantity out of that window. Later

on I missed Edmonds, and inquired where he went, and was told that he had gone around the building, and I went around there and found Edmonds; he had a garment, and said to me, 'What is this on here?' I smelled it and said, 'Kerosene, like the others.' He stated it did not smell like kerosene to him. I do not recall that there was any one with Edmonds at the time. Some of the goods that smelled like kerosene oil I took out of the store that night and later on put them in a can and sealed them up. These are the cans, which have been sealed ever since then, and the garments. (Cans opened, goods taken out and introduced in evidence and exhibited to the jury.) When Edmonds came to the store that night, he told me that he had been out of town most of that day; I asked him where he kept his matches; he said he didn't keep any around there; I asked him if he kept any oily rags; he said 'No'; I asked him if they had been painting around there any; he said 'No,' but later he said they had been varnishing. I asked him if any of them smoked around there, and he said they did not. However, in a few minutes he rolled a cigarette and lit it; I asked him where they kept the kerosene oil, and he said they did not have any. I told him there was some there, and the building had been set on fire; he hung his head and said he did not know anything about it. I asked him who had the key to the store, and he said he had the only key to the store, but later he said the clerk had a key—I won't say whether that was the next day or some subsequent date after the fire, I do not recall. He stated that he had been in the store more than once that night, is my recollection, but it is not clear as to the number of times nor the hours. The building was two-story and basement, which was used for store room, and there was very little in it; the first and second floors were not filled, did not seem to have any great quantity of stock there. I examined the entrances after the fire and found no evidence of breaking in except the window and door which were broken open in extinguishing the fire. Captain Cofer and I also examined the basement door leading to the outside, and found it fastened, and found the window closed. I examined all of the openings; I found no windows broken except those broken by the firemen. I went in the front, the floor is flush with the sidewalk; Lieutenant Brown went in on a ladder on the top floor; the building is three stories in the rear."

M. J. Brown, captain of fire company No. 2, who broke out a window at the back end of the store and fought the fire through that window, opening into the second floor, likewise testified to the strong odor of kerosene about that room.

The defendant Edmonds had $35,700 of insurance on his stock. An inventory was taken on 1 January, 1920, which showed a stock of $23,000. An inventory after the fire, but before the adjusters came,

showed $25,440.71.  Upon this stock Edmonds was indebted $24,500.
Edmonds himself was at this store twice that night after it had been
closed, the first time with his wife and children; the second time he went
alone to the building after the celebration had ended, he himself claiming
that he returned at that time only to turn out the lights, which were left
on in front of the building in accordance with the request of the man-
agers of the celebration.   The time at which he returned alone, by the
State's evidence, is fixed at somewhere about 10 o'clock or later.   De-
fendant claimed that it was about nine o'clock.   He some time previous
had complained to the police that some one was entering his store and
stealing his goods.   He said at that time that they entered through the
basement window.   Policeman Cofer had, however, arranged that win-
dow so that if any one entered he could detect that entry without
difficulty, and the night of the fire no one had entered that window.

*Attorney-General Manning and Assistant Attorney-General Nash for
the State.*
*J. H. Folger and Holton & Holton for defendant.*

WALKER, J.   As to the motion for a nonsuit, the refusal of which is
the basis of exceptions Nos. 1 and 4:   We must construe the evidence
most favorably to the State, in passing upon such a motion, is the
invariable rule of the law.   *Lynch v. Dewey,* 175 N. C., 152.   It is
obvious from the above short recapitulation of the evidence that the
defendant was the only person who had any motive for setting fire to
this store and the goods.   It also appears that he had an opportunity to
set fire to them, when he returned to the store alone.   It is obvious, also,
from the use of kerosene oil, that the goods were purposely set fire to
and not accidentally burned.   This evidence was amply sufficient to
carry the case to the jury upon the defendant's guilt or innocence, and
if his own testimony, and that of his wife, should be believed, or accepted
as true, he did not set fire to the goods.   The motion for a nonsuit,
therefore, was properly denied, as there was raised a clear issue of fact,
which the jury was properly required to pass upon.   The jury did pass
upon it, and as their verdict, they found him guilty.   From the judg-
ment thereon he appealed.

Exception 2:   The defendant H. D. Edmonds began business in his
own name on 8 August, 1919.   The business, however, was incorporated
1 January, 1920, as the H. D. Edmonds Clothing Company, with H. D.
Edmonds manager of it.   After the fire, the concern was forced into
bankruptcy.   The defendant was being cross-examined by the solicitor
with reference to this bankruptcy, and with a view of impeaching him,
when he asked him:  "What went with all that stock of goods from

14 April until September?" The defendant objected, but the court admitted the answer for the purpose of impeaching the witness only. Witness's answer was: "Well, I don't know; couldn't tell you exactly what went with it. All I got hold of (which was the company's money), I deposited in the Farmers Bank and checked it out to pay my creditors." This question was entirely proper in the cross-examination for the purpose of impeaching the witness.

Exception 3: B. A. Manion, clerk for the Edmonds Clothing Company, was being examined. It appeared that an extra policy of insurance amounting to $2,500 had been taken out on 15 March, 1920. Benbow Jones was the agent of the company which issued this policy. On Manion's direct examination he was asked by defendant's counsel: "What did the man who brought that policy there say about it?" The State objected, and the objection was sustained. Benbow Jones had not at that time been upon the stand, so this evidence was not admissible as corroborating him. It was simply a declaration by a third party, and no part of the *res gestæ*. The defendant afterwards placed Benbow Jones on the stand, who testified fully in regard to this policy. This cured the error, if any.

Exception 5 was to a part of the judge's charge in which he was stating a contention of the State. It is clear, we think, that in the state of the record this exception is not tenable. It was certainly founded upon evidence that appeared in the cause.

There was ample evidence from which the State might reasonably argue, and the jury find, that Edmonds was the last man in the store that night before the fire broke out, and there was no evidence that there had been any entrance into the building that night by any one, but Edmonds and his clerk, though there was evidence that Edmonds showed J. J. Cofer, and perhaps others, where some person trying to enter the store through the basement, had drawn the screws from the hinges of a door, through which one could go up from the store-room, which is in the basement, but the witness Cofer testified that you could not open the door by removing the hinges, because when the door was closed they were on the inside. Defendant told the witness Fred Lindsay, a traveling salesman who sold to him, that he had between $25,000 and $30,000 worth of goods in the store a short time before the fire. Lindsay was of the opinion, as he testified, that there was not more than between $5,000 and $10,000, and he would not give more than $5,000 for the goods if he were buying them. The policemen testified that the building was entirely closed at all doors and windows when they answered the alarm for fire, and reached the same, and that no one could enter it without breaking in, and there was no evidence of any breaking, or attempt to break in, if we omit the trivial circumstances as to the door

in the basement, which may have been, and likely was, but a preparation by Edmonds himself for some apparently reasonable explanation that he even then thought would be necessary to allay suspicion which would certainly rest upon him. There are numerous other circumstances, more or less cogent and convincing as evidence, that Edmonds is the guilty perpetrator of this nefarious attempt to cheat and defraud the insurance companies, and thereby get money to pay his large indebtedness, defray expenses, and cover heavy impending losses, he evidently being very much embarrassed by pressing debts and liabilities at the time, and in his haste he did not stop to calculate the destruction of his own property, or that in which he was largely interested, and the consequent risk he was taking in burning all adjoining property and eventually starting a conflagration which would likely have imperiled the entire city of Winston, and involve it in an appalling catastrophe, which we cannot contemplate except with undisguised horror and the severest condemnation for the cold, calculating, and reckless commission of crime, fraught with such disastrous consequences, and which threatened to entail so much destruction and such untold losses on the community, and the proud and rejoicing city, then in the act of celebrating the greatest event of its history, and he cared not, if, as once said, "among its proud arches the fires of ruin glowed." He took advantage of such an occasion to apply the torch to his own, and thus kindle the fires of destruction, in that beautiful and prosperous city, so that while others might suffer enormously, he could pay his debts and perhaps have something left. He looked upon the insurance money with a covetous and even avaricious eye. So great was the crime thus charged against the defendant, and so heinous, that we should be very careful to examine the evidence with the utmost scrutiny, but after doing so, we find that the proof of guilt is so strong and convincing, not to say conclusive, that it would be impossible to think, with seriousness, of dismissing the prosecution, which is asked to be done. The prisoner had the motive to commit the offense, because of the large stock of goods he pretended to have, and upon which, if they were destroyed by fire, he expected to realize handsomely. When told of the kerosene oil, he could not explain its presence, but dropped his head in token of his conscious guilt.

The prisoner was a large stockholder in the company, and had, therefore, a considerable interest in its general affairs, and especially in its stock of goods. His motive in burning it is, therefore, apparent. Motive is not always necessary to be proved, but if often, as it is in this case, evidence of guilt, as it tends to show the identity of the person who committed the crime.

Motive is not an indispensable, and not even an essential, element of this crime, but even when this is so, the existence of a motive may be

evidence to show the degree of the crime or to establish the identity of the person as the culprit, *S. v. Adams,* 138 N. C., 688; *S. v. Wilcox,* 132 N. C., 1143; *S. v. Adams,* 136 N. C., 620, but it is hardly required to show any motive here, as the other evidence of the prisoner's guilt is so very conclusive.

Exception number three, as to the Manion insurance policy. The evidence concerning this policy was insignificant, as compared with the other overwhelming proof, and may be left out of consideration without in the least impairing the strength of the other evidence against the prisoner.

Exception number five is also without any force or merit. It is the old and time-worn objection we so often meet with, and which is that the judge did not state the contentions correctly. If he did fail in this respect, he should have been requested to correct the error. The traveling salesman, who sold goods often to the prisoner, testified that, while he stated that he had $25,000 or $30,000 of insurance, he (the witness) did not think his stock was worth more than "near $5,000," a great disparity in the true value and the insurance.

There was clearly no error, and we must decline to change the judgment.